145 So.2d 207

Amos PIERCE

v.

Jesse W. MURPHREE.

7 Div. 502.

Supreme Court of Alabama.

Sept. 20, 1962.

Roy D. McCord and L. D. Martin, Gadsden, for appellant.

Inzer, Martin, Suttle & Inzer, Gadsden, for appellee.

**22**

LIVINGSTON, Chief Justice.

On the 8th day of January 1954, the appellant, Amos Pierce, filed his original bill of complaint in the Circuit Court of Etowah County, Alabama, in Equity, against the appellee, Jesse W. Murphree, seeking the specific performance of a contract to sell a certain described 120 acres of land located in Etowah County, Alabama.

The bill alleged, in substance, that in January 1949, the appellant agreed to buy from the appellee, and appellee agreed to sell to appellant, 120 acres of land described in said bill of complaint, at and for the sum of $9500; that he, appellant, was placed in possession of said lands; that the appellee was to apply all amounts due by the appellee to appellant at that time as a credit on the purchase price of said lands, and that appellant would pay the balance of the purchase price to appellee by the year 1952.

The bill further alleged that appellant had paid the balance of the purchase price by April 8, 1952, and prayed that the court grant to the appellant specific performance of the alleged oral contract for the alleged purchase of said lands, or in the alternative to establish a trust in said lands or to determine that appellant had a lien on said lands, and for general relief.

Demurrers to the bill were overruled and the appellee then filed an answer to the bill of complaint as amended, in which he stated, in substance, that he had purchased the real estate involved on January 18, 1949, and the said property was subject to a purchase money mortgage given by appellee to E. A. Rogers, Jr., and Albert S. Rogers.

The appellee further alleged in said answer, which was made a cross bill, that appellant had been in possession of said lands as a tenant of the appellee, and he further denied that he was in any way indebted to the appellant but that appellant was indebted to him for rents. Appellee further alleged in said answer that on April 8, 1952, appellant and his wife had by deed of that date, recorded in Book 501, page 151, in the office of the Judge of Probate of Etowah County, Alabama, conveyed all of their right, title, interest and claim in and to the real estate involved in this suit to appellee, and that, in fact, the appellant was at the

time of the execution of said deed indebted to the appellee for rent for the crop years 1949, 1950 and 1951 for said lands, said rent being on the basis of one-fourth of the cotton and one-third of all other crops grown on said property during said crop years, and that at the time said deed was made to appellee a settlement was made with appellant for said rents and other charges due by appellant to appellee. Said answer and cross bill further alleged that after the execution of the aforesaid deed, appellant paid to appellee rent for the crop year 1952, in the amount of $881.02, but that he had not paid any rents on said lands to appellee since 1952.

Appellee prayed in said answer and cross bill for the court to fix and award to him the rents due by appellant to him and to decree and establish that appellant had no right, title, interest or claim in and to the lands involved in said suit, or any part thereof.

On June 24, 1959, appellant amended his bill of complaint by adding thereto paragraphs 1(a) and 1(b), in which he alleged that he had been in continuous possession of the property and had paid for it by working for appellee, as set forth in his original bill of complaint, and further alleged that he had a running account and stated account against appellee.

The appellee also filed an amendment to his answer to said amended bill by adding thereto paragraphs 7(c) and 7(d), the substance of which is that appellee denied the allegations of said last amendment and again asserted that appellant had been in possession of the property as a tenant of the appellee, and appellee also denied that he was indebted in any manner to appellant.

The appellant again, on February 4, 1960, filed an amendment to his bill of complaint in which he again alleged, in substance, that he had paid for the property by his work and labor, and that if he was not entitled to the specific performance, he was entitled to have the property sold under an alleged oral trust for the satisfaction of his claim. In this amendment, appellant attempted to adopt as a part of the pleading the answer that he, the appellant, had filed to certain interrogatories propounded to him by appellee, and he also attempted to adopt as a part of the pleadings certain paragraphs of an answer and cross bill filed by the attorneys of appellee in a suit wherein appellee's wife had sued appellee for divorce.

The appellee filed a motion to strike the last-mentioned amendment as a whole, which motion was overruled, and the motions of appellee to strike the two paragraphs in said amended bill wherein appellant sought to adopt his answer to interrogatories and adopt pleadings in another case were granted by the court.

Appellee's demurrers to the amended bill were overruled.

Appellee then filed an amendment to his answer and cross bill so as to answer the bill as last amended. In effect, this amendment reassigned all matters theretofore set forth in the amended answer and cross bill of appellee in answer to the bill of complaint as last amended, and denied the factual allegations of said last amendment to the bill of complaint, and denied that appellant was entitled to any of the relief prayed for therein.

By decree, dated February 17, 1960, the trial court found and decreed that appellant had no right, title, interest or claim, and no lien or encumbrance upon the property involved in the suit, and that he had no right to possession of said property and was not entitled to relief as prayed in his bill of complaint as last amended. The court further held that the reasonable rental to be paid by appellant to the appellee for the lands involved in the suit from the year 1953 to 1959, both inclusive, was $5,000, and judgment was entered therefor.

From this decree, the appeal is taken.

█ The evidence in this case was taken before a commissioner and is not attended with the usual presumption of correctness as if heard ore tenus by the trial court. It is therefore our duty to review the evidence and to sit in judgment as to the facts established by it. This duty we have performed with painstaking care.

In the first place, the record is voluminous and is one of the most confusing we have examined. The evidence or the testimony of the parties and their witnesses is in hopeless conflict. Some of the witnesses flatly contradicted themselves. At least one of the witnesses refused to answer several questions bearing on the issues involved.

This is what we believe happened and what we find the facts to be:

Jesse W. Murphree, the appellee, was living in Jackson County, Alabama, in the year 1933. He was married to Sarah Hughes Murphree, and they were living together as husband and wife and had been for a number of years. Sometime after 1933, he moved to Cherokee County, Alabama, but his wife refused to follow him and continued to live in Jackson County. He was completely broke and owned no property whatever. Sometime later, he inherited from his father a one-fifth interest in 340 acres of land. In about 1938, he purchased 88 acres of land in Cherokee County. Immediately thereafter, he gathered some 15 young men who were his neighbors and friends around him, and they entered into an agreement or understanding that they would pool all their resources, which at the time consisted chiefly of labor and tools, and would farm the 88-acre tract that Murphree had bought, finish paying for it, and when this tract was paid for they would buy other tracts until all of them had homes of their own. As a part of this understanding or agreement, title to the land purchased was to be taken in the name of Murphree purely for the convenience of the interested parties, subject to the agreement, however, that when these men had accumulated sufficient credit by their labors to pay for the value of their farm, Murphree would execute and deliver to them deeds conveying to each of them a parcel of land for a home; that Murphree was unable to work and would act as overseer and supervise the purchase and cultivating of these lands. The appellant, Amos Pierce, was one of these young men.

As best we can gather from the record, Murphree acquired title to some 800 acres of land in Cherokee County. It appears that some of the young men dropped out of the scheme or plan at different times.

From about the year 1942 to the year 1949, Amos Pierce continued to live in Cherokee County and continued to labor under the agreement. As best we can gather from the record, these young men were to pay rent on certain portions of the land worked by them, which rent was to constitute a fund to purchase other lands. At the same time, they were to perform labor for Murphree at his sawmill and on other lands owned by Murphree and were not to receive pay for the labor, but the products of their labors and rents were to be used as a fund to purchase other lands.

Under this same arrangement, Murphree purchased 598 acres of land in Etowah County in 1949 from the Rogers Brothers. By agreement of the parties, Pierce moved to Etowah County on 120 acres of the land purchased from Rogers. The land was purchased from the Rogers Brothers for a consideration of some $38,000, of which $10,000 was paid in cash, and a purchase money mortgage executed by Murphree to the Rogers Brothers for $28,000. At the time of the trial of the instant case, this mortgage had been reduced to some $14,000.

The agreement between Murphree and Pierce at the time that Pierce moved to Etowah County and started farming the 120 acres of the Rogers' place was to the effect that when Pierce had paid the sum of $9500, Murphree would deed him the 120 acres. Pierce's prior labors and accumulations of some 6 to 8 years was to be

taken in consideration in the purchase of the 120 acres of the Rogers' place, and when Pierce's accumulations and labor amounted to $2000, after he moved to the Rogers' place, Murphree would deed him the 120 acres that he occupied of the Rogers' place, and that if said accumulations amounted to $2000 by the year 1952, Murphree would convey the 120 acres of the Rogers' place to Pierce.

From this confused record, we believe and find that Pierce completed and fulfilled his contract sometime during the year 1952.

In 1951, Murphree's wife sued him for divorce. At this time, some 1400 acres of land, and perhaps more, acquired under the said agreement or arrangement, stood in Murphree's name. There were several of the young men, including Pierce, who were still working for Murphree under the original agreement. Not one word of these agreements was ever put in writing, and apparently no records of anything were kept. At the time the divorce suit was pending against Murphree, he called together the young men in the courthouse in Gadsden, Alabama, with his lawyer from Scottsboro, Alabama, and they reviewed the whole situation, and the young men agreed to give Murphree a quitclaim deed to all the land to enable Murphree to make a satisfactory settlement with his wife in the divorce suit, with the understanding that when he settled with his wife their interest in the land would be protected. He did settle his divorce suit with his wife by paying her $10,000 in cash.

There was introduced in evidence over the objection of the respondent, Murphree, on the trial of this case, a part of the pleadings in the divorce case, which is as follows:

" 'IV Cross-complainant *futher* (sic) avers and shows that in the year 1933 he was living in Jackson County, *Alabma* (sic), was completely broke and owned no property whatever; that the opportunities of earning a *livlihood* (sic) appeared more favorable in Cher-

okee County where he went and obtained work as a farm hand, and where he continued to work as a laborer until the year 1938 when he purchased a small tract of land, as aforesaid. Immediately thereafter he gathered some fifteen (15) young men, who were his neighbors and friends, around him and they entered into an agreement or understanding that they would pool all their resources, which at the time consisted chiefly of labor and tools, and would farm the eighty-eight (88) acre tract that cross-complainant had bought, finish paying for it and when this tract was paid for they would buy other tracts until all of them had homes of their own. As a part of this understanding or agreement, title to the lands *purchsed* (sic) was taken in the name of your cross-complainant purely for the convenience of the interested parties, subject to the trust, however, that when these men had accumulated sufficient credit by their labors to pay for the value of a farm, your cross-complainant would execute and deliver to them deeds conveying to each of them a home; that your cross-complainant was unable to work and would act as overseer and supervise the purchase and cultivating of these lands. This arrangement and trust relation has been followed since its inception about the year 1939, and in keeping with the understanding and trust your cross-complainant and Wendell Rosser, Amos Pierce, A. T. Morris, John W. Williams, Gun Henson, Joe Jennings, Jr., Marvin Cox, Hardy Cox, J. C. Henson and Olin Pool have accumulated the lands described in the original bill of complaint, with the exception of Parcels 9 and 10. The total of these two tracts as described in the original bill of complaint aggregates 1403 acres, whereas only a ½ interest in Parcel 10 is owned by your cross-complainant and the above named parties.' "

Also, over the objection of the respondent Murphree, the following testimony of

Murphree in the divorce case was introduced in this case:

"My name is J. W. Murphree. I will be 69 years old the 14th day of this month. I am not able to do any hard or manual labor. I haven't done any manual labor in seven or eight years. I was married to Sarah Hughes over in Jackson County and lived together as man and wife a number of years. Later on I came to Cherokee County and I have lived in that county since that time, most of the time. I requested my wife to move to Cherokee County with me. She continued to live in Jackson County. At the time we separated, I owned an interest in my father's estate, consisting of 340 acres of land or about that. My interest in that was ⅕th. Since I came to Cherokee County I accumulated some property. I own several different tracts of land and that land is heavily mortgaged. I had you to estimate my indebtedness and it amounted to approximately $77,400. That is about the amount that I owe at this time. Basing it on its present day value of all the land I own is approximately $95,100. The only equity I have in the land is approximately $16,650. That includes all the property that I own. This indebtedness I owe is owed to several different parties. Since Mrs. Murphree filed her application for divorce I filed a cross bill, and set up that several men who had worked with me through the years owned an interest in this property. While the matter has been pending I have made a settlement with all the parties I named—I got quit claim deeds. *All the parties named as respondents in the cross-bill have reached an agreemnt with me and given me a quit claim deed so that I can make a settlement with them.* Since this suit has been pending my wife and I have come to an agreement about division of the property, through her attorney Mr. Keener. By the terms of that agreement I am to pay her the sum of $10,-000, and she relinquishes all her right, title, claim and interest in and to the property described in my cross-bill. By the terms of the agreement, with the approval of the court, both of us are to have an absolute divorce. I understand that. The $10,000 I am paying Mrs. Purphree (sic) represents approximately half of my net ownings at this time." (Emphasis supplied.)

The foregoing testimony was signed by Murphree on July 2, 1952, on the same day Murphree moved the court that his cross bill be dismissed. On July 8, 1952, the divorce decree was entered, and on the same day Murphree's motion to dismiss his cross bill was granted.

On the trial of the instant case, several witnesses were examined by both parties. The evidence of these witnesses, including the parties to the suit, is quite involved and confused, and no attempt will be made to summarize the testimony of each witness. The evidence is often contradictory, almost invariably confused, and even when that is not the case, exceedingly indefinite and inconclusive. In several instances, witnesses would admit in later testimony the very facts that they had earlier denied. Some of the witnesses who are said to have been parties to the agreement or arrangements flatly denied the existence of it. Murphree himself, in effect, said he never heard of it. On the other hand, some of Pierce's witnesses who were also said to be parties to the agreement or arrangements testified that there was such an agreement or arrangements.

Pierce testified that the value of his services performed over a period of about 12 years amounted to twelve or $13,000, and that he performed labor for Murphree some years as much as six months a year, and in other years for a less period of time; that he had received no pay from Murphree whatever. Murphree produced no checks showing payments of any amounts to Pierce during the whole period of time, although one witness for Murphree did testify that

he kept Murphree's books and that Pierce was paid for his labor.

In testifying as to the arrangements or agreement between Murphree and the young men who he gathered around him, Mr. Jenings, a witness for Pierce, testified, in part, as follows:

"Q. Have you heard him discuss the question of buying a farm for everybody, many times or few times?

"A. Yes, sir, plenty of times.

"MR. MARTIN: We object to that.

"A. I had to law mine out of him.

"MR. MARTIN: We object to that and move to exclude that voluntary statement.

"Q. You say you brought a law suit?

"A. Yes, sir.

"Q. And got your farm?

"A. That's when I got it."

▇▇▇ The principles of law applicable to the facts in the instant case cannot be better stated than is found in the language of Justice Simpson in the case of Talley v. Talley, 248 Ala. 84, 26 So.2d 586, as follows:

"Violation of a parol trust agreement or its subsequent repudiation is not of itself that character of fraud which will suffice to sustain the trust. Patton v. Beecher, supra [62 Ala. 579]; Bartlett v. Bartlett, 221 Ala. 578, 130 So. 194.

"The bill makes no showing of such antecedent, original fraud as would bring the transaction within the ambit of the announced doctrine, so a constructive trust cannot be established.

"It remains then to consider whether or not the allegations are sufficient to enforce an interest in the property on the theory of a joint undertaking between the parties to purchase it.

"Under the rule of our cases a parol, executory agreement for the purchase of an interest in land is invalid under the statute of frauds and this applies to partnerships and joint adventures. Butts v. Cooper, supra [152 Ala. 375, 44 So. 616]; Allen, Adm'r, et al. v. Caylor, 120 Ala. 251, 24 So. 512, 74 Am. St.Rep. 31; Rowland v. Boozer, 10 Ala. 690, 694; Larkins v. Rhodes, 5 Port. 195, 200, 201; 27 C.J. § 207, p. 222; 37 C.J.S., Frauds, Statute of, § 119.

"Unless the facts bring the case within one of the statutory exceptions, if the parol agreement between the two parties for the purchase of real estate from a third person 'involves a purchase by, or in the name of, one party and a subsequent transfer, conveyance, or vesting of an interest in the property to or in the other party, the statute of frauds applies.' 37 C.J.S., Frauds, Statute of, § 119, subsec. b, p. 614.

"If, however, the contract has been fully performed, by the seller putting the purchaser in possession under the contract and the purchaser paying the seller a part or all of the purchase price, the contract is valid and is saved by the exception. Code 1940, Title 20, § 3, subdivision (5); Stearnes v. Woodall, 218 Ala. 128, 117 So. 643.

"True, the purport of the bill, with the deed exhibited thereto, is that Graves was the seller and defendant was the purchaser but as regards the plaintiff, the defendant, who bought the property in his name under the agreement aforesaid, was her substituted vendor, and when she went into possession under the contract and paid her part of the purchase price according to its tenor, she acquired a vested, valid interest in the land and equity will intervene to protect that interest. Stearnes v. Woodall, supra.

"Though payment and possession must concur to save the purchase from the grasp of the statute, the two acts

need not be contemporaneous. If the purchaser is put in possession and thereafter pays the purchase money or a part of it, or if he pays the purchase money and is thereafter put in possession under the contract, the transaction is drawn under the exception and is enforceable. City Loan, etc., Co. v. Poole, 149 Ala. 164, 43 So. 13; Adams v. Adams, 235 Ala. 27, 176 So. 825; Nelson v. Shelby Mfg. & Imp. Co., 96 Ala. 515, 11 So. 695, 28 Am.St.Rep. 116.

"Ordinarily possession of a tenant in common orally contracting to buy an interest in the land from the cotenant is insufficient as part performance of the contract to satisfy the possession aspect of the exception. West v. McKay, 225 Ala. 397, 143 So. 573.

"If, however, as here, the possession of the cotenant is referable exclusively to the purposes of the contract sought to be enforced and be such as would not be done but for it, the possession is sufficient part performance to satisfy that phase of the exception. West v. McKay, supra; Formby v. Williams, 203 Ala. 14, 81 So. 682; Jones v. Jones, 219 Ala. 62, 121 So. 78; Hagood v. Spinks, 219 Ala. 503, 122 So. 815.

"The allegations of the bill, we think, bring the verbal contract within the influence of the last stated principles so as to exclude it from the inhibition of the statute and the demurrers were properly overruled."

■ As indicated above, and we find, that the appellee Murphree did make an agreement with appellant Pierce, and with others; that the appellant did perform services under the agreement from sometime in the year 1942 until January 1949, at which time the Rogers' place in Etowah County was purchased, and at which time Pierce moved to Etowah County on the 120 acres now claimed by him; that Pierce went into possession of the 120 acres of the Rogers' place with the understanding with Murphree that he was to be given a deed to the 120 acres

when his services to Murphree and the rents paid to Murphree would amount to the sum of $2000. Certainly, Pierce would not have moved to Etowah County under a new agreement to the effect that they would pay for the Etowah County land under the new agreement, and that Pierce would lose the value of his services and payments for rent made to Murphree prior to that time.

At the time the quitclaim deed was given by Pierce and others to Murphree, the record title stood in Murphree's name, and according to Murphree's own testimony:

"I got quitclaim deeds. All the parties named as respondents in the cross bill [we interpolate—the men who are working for Murphree to acquire farms and homes] have reached an agreement with me and have given me a quitclaim deed, *so that I can make a settlement with them.*" (Emphasis supplied.)

We think the giving of the quitclaim deed was nothing more nor less than a part of the same general plan, or scheme, for the appellant, Pierce, to acquire a home and a parcel of land, and for the purpose of Murphree's making a settlement with his wife in her action for divorce, though the reasons for this maneuver are not at all clear.

■ We are clear to the conclusion that when Pierce moved on the Etowah County land he had already paid a part of the purchase price, and in our opinion, he paid the balance of the purchase price after he took possession of the 120 acres. He has, therefore, paid the purchase price in full, and he was put in possession by Murphree in accordance with the terms of the agreement and is entitled to specific performance of the contract made by Murphree to convey it to him. This occurred sometime in the fall of 1952, and at which time he was under no more obligations to pay rent to Murphree.

■ It is true that the whole of the Rogers' place is under the mortgage to the Rogers Brothers, but we are of the opinion

and hold, that it is Murphree's obligation to pay it.

The cause is reversed and remanded to the lower court with instructions to enter a decree in conformity with the above.

Reversed and remanded with directions.

GOODWYN, COLEMAN and HARWOOD, JJ., concur.